## GERALDINE LIPSHIE *v.* GEORGE M. TAYLOR AND SON, INC.
### (SC 16904)

Borden, Katz, Palmer, Zarella and Pellegrino, Js.

Argued May 21—officially released August 5, 2003

*Charles F. Brower*, for the appellant (defendant).

*Neal L. Moskow*, with whom was *Deborah M. Garskof*, for the appellee (substitute plaintiff).

*Opinion*

BORDEN, J. The dispositive issue in this appeal[1] is whether there was sufficient evidence for the trial court's finding that, because of the defendant's alleged breach of contract and negligent misrepresentations, a certain proposed real estate transaction between the plaintiff and a contract purchaser of the property failed. We conclude that there was not sufficient evidence

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

and, accordingly, we reverse in part the trial court's judgment in favor of the plaintiff.

The plaintiff, Geraldine Lipshie,[2] brought this action against the defendant, George M. Taylor and Son, Inc., claiming breach of contract and negligent misrepresentation.[3] After a trial to the court, the court found for the plaintiff on both claims, and awarded damages in the total amount of $135,900. This appeal followed.

The defendant claims that: (1) there was insufficient evidence to support the trial court's finding that, as a result of the defendant's conduct in breaching its services contract with the plaintiff, and in making certain negligent misrepresentations to the plaintiff, the contract purchaser of the plaintiff's real estate did not go through with the closing; and (2) the measure of damages awarded by the trial court for the lost profit on the aborted real estate sale was outside the contemplation of the parties. Because we agree with the defendant's first claim, it is not necessary to reach the second claim.

The following facts were either found by the trial court or were undisputed at trial. The plaintiff, who lived with her husband, Norman Lipshie, in New York City, owned the property in question located on Mill-

---

[2] After the commencement of the action, the plaintiff, Geraldine Lipshie, died, and Norman Lipshie, the executor of her estate, was substituted as party plaintiff. For convenience sake, references here to the plaintiff are to Geraldine Lipshie.

[3] The plaintiff also made claims for negligence, breach of a covenant of good faith and fair dealing, tortious interference with a business relationship, tortious interference with a contract, and intentional misrepresentations. At the conclusion of the trial, the trial court dismissed the claims for breach of a covenant of good faith and fair dealing, tortious interference with a business relationship, tortious interference with a contract, and intentional misrepresentations. In addition, the court found that, in light of its finding that a breach of contract took place, the negligence claim did "not apply." The plaintiff has not challenged, by way of a cross appeal, any of these determinations. Accordingly, they are not before us in the present appeal.

erton Road, in Lakeville, Connecticut. The property abutted ninety-eight feet of lakefront on Lake Wononscopomuc and then sloped upward to the roadway. It contained a main house at the bottom of the hill by the lakefront and a guest cottage located at the top of the hill. The defendant is a corporation in the oil delivery and maintenance business, and did business with the plaintiff from the mid-1980s through 1997. The defendant provided oil delivery, and repair and maintenance to the heating system on the plaintiff's property. Over the years, the parties relied on an oral agreement for the defendant's services.

By the mid-1990s, due to the illness of the plaintiff, her use of the property began to decrease and, in 1996, the plaintiff listed the property for sale with a realtor, Pat Best. In August, 1996, Best produced a purchaser, Melissa Bostrom, with whom the plaintiff entered into an option agreement for the purchase of the property for $700,000, exercisable between January 1, 1997, and January 31, 1997. The option agreement was supported by a payment of $17,500, to be held in escrow by the plaintiff's attorney, Alice B. Yoakum, and contained a contingency clause that, insofar as is relevant to the present case, provided that: the seller, at her expense, prior to the execution of a contract for sale, would remove the underground fuel tank and any soil contamination discovered on the premises, in a manner consistent with the standards of the state department of environmental protection (department); the purchaser, at her expense, prior to the execution of a contract for sale, would install a replacement tank located inside the guest cottage in a manner consistent with the standards of the department; the final decision on the size and location of the tank would be made in consultation with the fuel oil supplier; and, if the option were terminated, the seller would reimburse the purchaser for the cost of installation of any new tank, and the seller would

have the right to approve the cost, fuel dealer and location of the tank.[4]

In late August or early September, 1996, after the option agreement had been signed, Norman Lipshie met with the defendant and discussed the impending sale and the need to take care of the contingency prior to the sale of the property. The defendant agreed to perform the work, namely, removal of the underground tank, any necessary cleanup, and installation of a new tank in the cottage. This agreement was reached orally, which was consistent with the long-term relationship between the parties regarding work at the plaintiff's property.

The trial court found further that, subsequent to this meeting between Norman Lipshie and the defendant, both Norman Lipshie and Best contacted the defendant inquiring when the work would be performed, and relating that they anticipated that it must be completed before December 18, 1996. Nonetheless, the defendant did not apply for a local permit until that date, the permit that it secured on that date was not signed by the town building inspector, the defendant did not do the work until that date, and when the building inspector arrived on the property on December 18, 1996, to inspect the removal of the old tank and installation of

[4] The specific terms of the contingency clause provided as follows: "Notwithstanding the foregoing, Seller, at Seller's expense prior to the execution of the Contract of Sale, shall remove the underground fuel tank and any soil contamination should any be discovered on the premises in a manner consistent with the standard of the Connecticut Department of Environmental Protection.

"Purchaser, at Purchaser's expense, prior to execution of Contract of Sale, shall install a replacement tank located in the interior of the guest cottage in a manner consistent with the standards of the Connecticut Department of Environmental Protection. Final decision on the size of the tank and its location shall be made in consultation with the fuel oil supplier. If the option is terminated, the Seller shall reimburse the Purchaser for the cost of the installation of any new tank. Seller shall have the right to approve the cost, fuel dealer and location of the tank."

the new tank, the defendant already had completed the work.

When the building inspector arrived, he found that the underground tank had been leaking before its removal, and that the defendant not only had removed the tank but also had removed oil-contaminated soil from the tank site and then had backfilled the hole from which the tank had been removed. Accordingly, the building inspector reported to the department that there was contaminated soil at the site. Further, he found that, because the defendant had installed the new tank inside the cottage within five feet of the oil burner, it was in violation of the town building code. Consequently, the inspector did not approve the defendant's work.

The trial court also found that, despite these problems, the defendant had advised the plaintiff, on December 18, 1996, or shortly thereafter, that the work had been completed satisfactorily. The defendant did not advise the plaintiff of any problems regarding the removal of the tank, contamination of the soil, or installation of the new tank. In addition, during this period, Best contacted the defendant to confirm that the work had been completed, and was advised by the defendant that all work had been performed and that there was no contamination at the site or any other problem with the work.

On January 27, 1997, the plaintiff and Bostrom entered into a contract for the purchase and sale of the property. The purchase price was $700,000, of which the $17,500 option payment was recognized as a partial down payment. The agreement called for a closing date of March 31, 1997, but did not contain a " 'time is of the essence' " clause. It also provided that "any previous agreements between the parties for the sale of the Premises shall be superseded hereby and any such prior

agreements shall be null and void." In addition, the agreement contained the following covenant and representation by the plaintiff: "Seller represents, in order to induce [Purchaser] to enter into this Contract, unless otherwise stated, that to the best of Seller's knowledge, information and belief, at the time of closing of title that . . . (d) During Seller's term of ownership . . . (2) that there has been no discharge, spillage, uncontrolled loss, seepage or filtration of oil, petroleum, or chemical liquids or solid, liquid or gaseous products or hazardous waste onto and/or emanating from the Premises; (3) that the Premises have not been the subject of an investigation or order by the Connecticut Department of Environmental Protection or any other state or federal environmental agency concerning any form of discharge or spill described in subparagraph (2) of this paragraph."

On January 28, 1997, after the execution of this contract, Yoakum received a copy of the building inspector's notice to the defendant disapproving of its work, and of the department's "Emergency Incident Report" regarding the contamination. On January 29, 1997, Yoakum faxed a copy of these notices to the defendant in an effort to obtain an answer to the issue, and around that same time notified the plaintiff as well.

As a result, the plaintiff hired Florian Palmer to test the site in order to determine the extent of the contamination. Palmer concluded that the property was contaminated extensively with oil, that portions of the abutting property also were contaminated, and that the contamination needed to be remediated. Norman Lipshie notified the plaintiff's homeowner's insurance company, which hired Lincoln Environmental to do the cleanup work. Lincoln Environmental began its work in February, 1997, and completed it in mid-May, 1997. The plaintiff's homeowner's insurance company paid the cost associated with this remediation work. Further,

the plaintiff hired another company to replace the non-conforming oil tank with a new tank, at a cost to the plaintiff of $3900.

The trial court found further that the plaintiff's contract with Bostrom required that all remediation be completed by the closing date of March 31, 1997, and that "the reason the deal fell apart was due to the remediation not having been completed."[5] Thus, the trial court's critical finding regarding causation as to why the plaintiff's sale to Bostrom did not go through was because remediation had not been competed by March 31, 1997, the closing date called for in the purchase agreement. The court found, in addition, that after the Bostrom deal did not close, the plaintiff put the property back on the market, and ultimately sold it to another buyer in February, 1999, for $568,000.

Regarding the plaintiff's breach of contract claim, the court specifically found that the parties had an implied in fact contract whereby the defendant was to remove the underground oil tank, do necessary remediation, and replace the removed tank with a new tank in the

---

[5] As evidentiary support for this finding, the trial court initially cited the testimony of Yoakum. Although Yoakum did not testify at the trial, a portion of her deposition testimony was introduced into evidence. The portion of Yoakum's testimony on which the trial court initially relied, however, was her testimony that, in response to a question as to whether the contamination could be removed prior to the closing date, she testified "I *mean that's the reason it fell apart, the deal fell apart.*" (Emphasis added.) Thereafter, however, the defendant moved to open the judgment on the basis that the parties specifically had agreed that the testimony would not be admissible, but had been included inadvertently in the trial exhibit of the deposition. In response to this motion, the trial court stated: "This one line was not the sole evidence the court relied upon to reach its findings in this case. The court concludes that the testimony of both [Norman] Lipshie and . . . Best were persuasive to the court in . . . reaching its conclusion as to why the Bostrom sale did not take place. This reference was not the only evidence the court relied on to make this finding. Therefore, the court concludes that this additional evidence, although not to have been considered by the court, was harmless error and does not affect the findings and conclusions made by the court."

cottage where the furnace and burner were located. The court also found that the defendant breached the contract by unduly delaying its performance and, therefore, did not perform the contract in a timely fashion, did not perform it in a workmanlike fashion, and failed to comply with state and local regulations.

Regarding the negligent misrepresentation claim, the trial court found that the defendant was liable because the defendant knew that the plaintiff had a prospective purchaser, and that the sale was contingent on the removal of the underground oil tank, cleanup of the site, and installation of a new tank in the cottage. The court also found that the defendant made negligent misrepresentations to the plaintiff in that it neither notified the plaintiff that oil contamination had been found nor that the new tank was nonconforming; instead, the defendant advised the plaintiff that everything "went fine."

Regarding damages, the trial court first found that the plaintiff had been required to hire another company to remove the nonconforming oil tank at a cost of $3900. In addition, on both the breach of contract and negligent misrepresentation counts, the court awarded the plaintiff damages of $132,000, representing the lost benefit of the bargain with Bostrom, namely, the difference between the Bostrom sale price of $700,000, and the ultimate sale price of $568,000.

The defendant claims that, absent the stricken deposition testimony of Yoakum; see footnote 5 of this opinion; there was insufficient evidence on which the trial court reasonably could have found that the Bostrom deal did not close because remediation had not taken place by March 31, 1997, the closing date called for in the purchase agreement. Consequently, the defendant maintains, the trial court's critical finding regarding causation was clearly erroneous. The defendant contends,

therefore, that the court's award of damages for both the breach of contract and negligent misrepresentations, in the amount of $132,000, cannot stand.[6] We agree.

The determination of causation in the present case is a finding of fact, subject to the clearly erroneous standard of review on appeal. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Frillici* v. *Westport*, 264 Conn. 266, 277, 823 A.2d 1172 (2003); *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 23, 807 A.2d 955 (2002). We conclude that there was no evidence on which the trial court reasonably could have found that the reason that the Bostrom sale did not close was that the remediation had not taken place by March 31, 1997.

We first note that neither the plaintiff, Bostrom, nor Bostrom's attorney testified. Furthermore, the contract between the plaintiff and Bostrom did not provide that time was of the essence. Therefore, it cannot be inferred solely from the failure of remediation to take place by March 31, 1997, that Bostrom relied on a clear contractual right to refuse to close after March 31, 1997.[7]

---

[6] The defendant does not challenge the award of $3900 for the reinstallation of the improperly installed new oil tank in the cottage. As we indicate later in the opinion, therefore, this portion of the judgment must be affirmed.

[7] Unless a contract for the purchase of real estate provides that time is of the essence, a failure to meet a closing date does not automatically establish a breach; the law provides that the parties must close within a reasonable time of the closing date. *Kakalik* v. *Bernardo*, 184 Conn. 386, 392, 439 A.2d 1016 (1981) ("In real estate contracts, the fact that a specific time is fixed for payment or for conveyance does not make time of the essence—at least, it does not make performance at the specified time of the essence. Failure to pay at that time is not per se sufficient to terminate the seller's duty to convey; and failure to convey on the exact date does not per se discharge the buyer." [Internal quotation marks omitted.]); *Tulisano* v. *Schonberger*, 74 Conn. App. 101, 106, 810 A.2d 806 (2002) ("When the parties

We focus, therefore, on the only two evidentiary sources relied on by the trial court for its finding, namely, the testimony of Best and of Norman Lipshie. The only testimony of Best bearing on the critical issue of causation was that: during the fall of 1996, Bostrom "was waiting for results to make sure that the tank came out and that there was no contamination"; and that Bostrom had a lease on a rental property that was to expire "[s]ometime in the spring of [19]97." Similarly, the only testimony by Norman Lipshie bearing on the critical causation issue was that: there was a "timing issue" between getting the defendant's work removing any contamination completed and the execution of the contract, and that both he and Best were "pushing for it"; if the remediation had been done timely in September, 1996, "we could have had the two and a half or three months it would take and it would not have taken that long"; and when asked "[w]hat happened to [Bostrom] in this entire affair," Norman Lipshie replied, "[Bostrom], she asked for her money back and we gave it to her and I—and it's—that's all I know myself." Simply put, none of this testimony, whether taken in isolation or together with all of the documents in evidence, reasonably supports the inference that Bostrom refused to close on the sale because the remediation had not been completed by March 31, 1997. The reason or reasons why Bostrom asked for and received her money back and that the sale was cancelled were, on the state of this record, left to speculation. The award of damages in the amount of $132,000, therefore, must be vacated. As we indicated previously, however,

---

to a real estate contract want to fix a specific date for performance, we generally have required them to express specifically in the contract that time is of the essence; otherwise, performance within a reasonable time will satisfy the contract. . . . Where the agreement does not specifically state that time is of the essence, it is presumed not to be unless the parties have expressed a contrary intent." [Citation omitted; internal quotation marks omitted.]).

because the defendant does not challenge the separate damage award of $3900 for the replacement of the nonconforming tank, that portion of the award must stand.

The judgment is reversed in part and the case is remanded with direction to render judgment in favor of the plaintiff in the amount of $3900.

In this opinion the other justices concurred.