# COMPANIONS AND HOMEMAKERS, INC. *v.*
# A&B HOMECARE SOLUTIONS, LLC
## (SC 20642)

McDonald, D'Auria, Mullins, Ecker and Alexander, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendant for its allegedly tortious interference with contractual relations and its alleged violation of the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.). The parties are home care service providers that participate in the Connecticut Home Care Program for Elders, which is operated by the Department of Social Services. In connection with that program, the parties each entered into a provider enrollment agreement with the department, pursuant to which the department matched each party with elderly individuals who were at risk of being placed in nursing homes, to whom the parties' employees provided nonmedical personal, home-making and companion care. In 2016, the department notified program participants that they would be required to use a new electronic billing system effective January 1, 2017. The plaintiff invited other program participants to join in a lawsuit challenging the implementation of the new billing system, which the defendant and three other program partici-pants accepted. The defendant's chief executive officer, G, represented to the plaintiff that the defendant had operational concerns about the new system and had not been given enough time to train its employees, and he personally approved the filing of a legal action against the depart-ment. In that action, the program participants alleged that they were unable to implement the new system and sought injunctive relief. The plaintiff subsequently learned that the defendant had been using the new system to bill the department, but G assured the plaintiff that the defendant had only been testing the system and was convinced that it was unworkable. In December, 2016, the program participants were denied prejudgment relief against the department, and, after G confirmed that the defendant would like to continue participating in the lawsuit, the plaintiff filed an appeal that included the defendant as an appellant. The day after the decision denying prejudgment relief was issued, G

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

communicated with B, a director at the department, about the defendant's successful efforts to implement the new billing system and its commitment to bill using the system. G nonetheless assured the plaintiff's general counsel that the defendant would not take any of the plaintiff's clients or recruit any of its employees, who were bound by noncompete agreements with the plaintiff. On December 29, 2016, the plaintiff informed the department via letter that it would not meet the deadline for implementation of the billing system. Days later, the department terminated the plaintiff's provider enrollment agreement due to the plaintiff's refusal to comply with the billing system requirement. Thereafter, the department immediately began to refer the plaintiff's clients to the defendant, and between eighty and eighty-five of the plaintiff's clients ultimately were transferred to the defendant. Subsequently, the plaintiff filed the present action against the defendant, specifically alleging that the defendant had tortiously interfered with the plaintiff's provider enrollment agreement with the department, and with the plaintiff's noncompete agreements with its employees, and that the allegedly tortious interference constituted a violation of CUTPA. Following a bench trial, the trial court rendered judgment for the plaintiff on all counts. The court's conclusion that the defendant had tortiously interfered with the provider enrollment agreement was based on its finding that the defendant's conduct during the billing system litigation against the department, and, specifically, G's numerous statements and assurances to the plaintiff, constituted fraudulent misrepresentation. The court reasoned that the defendant's misrepresentations throughout that litigation had been meant to interfere with the provider enrollment agreement between the plaintiff and the department, and had harmed the plaintiff, insofar as the defendant's scheme undermined the plaintiff's position in the billing system litigation against the department and demonstrated to the department that the defendant was prepared to use the new billing system and willing to take the plaintiff's clients. The court also found that the defendant had tortiously interfered with the plaintiff's noncompete agreements with its employees and that the defendant's interference with the plaintiff's contractual relations violated CUTPA. The court awarded the plaintiff compensatory damages in the amount of $118,008 for the lost profits relating to the transfer of its clients to the defendant, as well as punitive damages and attorney's fees pursuant to CUTPA. On the defendant's appeal from the trial court's judgment, *held*:

1. There was no merit to the defendant's claim that the trial court improperly found that the defendant had tortiously interfered with the plaintiff's provider enrollment agreement with the department on the ground that the defendant did not owe the plaintiff a duty to disclose:

   The trial court did not base its finding of fraudulent misrepresentation on the defendant's failure to disclose but, rather, on express misrepresen-

134 OCTOBER, 2023 348 Conn. 132

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

tations, as the trial court made clear that it found that the defendant, through G, had made multiple false, express representations to the plaintiff, which the plaintiff relied on to its detriment.

Specifically, the trial court found that G had approved the filing of the complaint in the billing system litigation, in which it was alleged that the defendant was unable to implement the new billing system, and that G made other statements about the defendant's concerns with the new billing system, even as the defendant continued to implement that system.

The trial court also found that the extent of the defendant's use of the new system undermined the representations made in the complaint in the billing system litigation and belied G's representation that the defendant had tested the system only on a limited basis, and that the plaintiff acted on G's assurances that the defendant would not take the plaintiff's clients.

Moreover, the trial court found that G's statements were deceptive both because G had repeatedly assured the plaintiff that the defendant could not implement the new system even though it did so and because G assured the plaintiff that the defendant would not take the plaintiff's clients even though it made a concerted effort to do so, and that this deception was actuated, at least in part, by an improper purpose, namely, to interfere with the plaintiff's provider enrollment agreement with the department.

2. The evidence was sufficient to support the trial court's finding that the defendant's tortious conduct caused the plaintiff to sustain damages:

Contrary to the defendant's argument that there was no evidence that it caused or played a role in the department's decision to terminate the plaintiff's provider enrollment agreement, the evidence was sufficient to support the trial court's finding that the department had relied on G's assurances that the defendant could take over the plaintiff's clients if the plaintiff's provider enrollment agreement was terminated because, although certain department officials testified that the department had not relied on any communications with G in deciding to terminate the plaintiff's provider enrollment agreement, the trial court apparently did not credit that testimony and reached a contrary conclusion on the basis of other evidence.

Specifically, in concluding that the department knew that the defendant was available to take over the plaintiff's clients and relied on that fact in deciding to terminate the plaintiff's provider enrollment agreement, the trial court reasonably could have relied on the ample, circumstantial evidence presented at trial, including B's testimony that she was aware of the defendant's use of the new billing system, that she had communicated directly with G about the defendant's taking over the plaintiff's clients,

348 Conn. 132　　　OCTOBER, 2023　　　　135

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

and that she was involved in the decision to terminate the plaintiff's provider enrollment agreement.

Moreover, the trial court found that the plaintiff's decision to inform the department that it would not meet the billing system implementation deadline was made in reliance on G's assurances that the defendant would not take the plaintiff's clients or recruit the plaintiff's employees, and the defendant did not dispute that the decision to so inform the department led directly to the department's decision to terminate the plaintiff's provider enrollment agreement.

Furthermore, the record supported the trial court's finding regarding the amount of damages that the plaintiff had sustained as a result of the defendant's conduct, insofar as the court relied on the testimony of the plaintiff's expert, who determined that the plaintiff had incurred $118,008 in lost profits as a result of the department's transfer of the plaintiff's clients to the defendant after the department terminated the plaintiff's provider enrollment agreement.

3. In light of this court's conclusion that the evidence was sufficient to support the trial court's finding that the defendant had tortiously interfered with the plaintiff's provider enrollment agreement, the defendant could not prevail on its claim that the trial court improperly found that the defendant had violated CUTPA on the ground that it did not engage in such tortious conduct.

4. This court declined to address the defendant's claim that the trial court improperly found that the defendant had tortiously interfered with the noncompete agreements between the plaintiff and its employees, as any error in this regard was harmless because the court's award of damages was independently supported by its finding that the defendant had tortiously interfered with the plaintiff's provider enrollment agreement with the department.

Argued December 14, 2022—officially released October 10, 2023

*Procedural History*

Action to recover damages for, inter alia, tortious interference with contractual relations, and for other relief, brought to the Superior Court in the judicial district of Hartford and tried to the court, *Hon. Robert B. Shapiro*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment for the plaintiff, from which the defendant appealed; thereafter, the defendant filed an amended appeal, and the plaintiff filed a cross appeal; subsequently, C&H Holdco, Inc.,

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

was substituted as the plaintiff, and the cross appeal was withdrawn. *Affirmed.*

*Thomas J. Donlon*, with whom were *Patrick W. Begos* and, on the brief, *Trevor L. Bradley*, for the appellant (defendant).

*James P. Sexton*, with whom were *John R. Weikart* and, on the brief, *Julia K. Conlin* and *Megan L. Wade*, for the appellee (substitute plaintiff).

*Opinion*

ECKER, J. This is an appeal from a judgment, rendered after a bench trial, awarding damages to the plaintiff, Companions and Homemakers, Inc. (Companions),[1] for tortious interference with contractual and business relations and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.[2] The defendant, A&B Homecare Solutions, LLC (A&B), doing business as Northwest Homecare, raises four claims of error: (1) the trial court improperly found that A&B's misrepresentations were tortious because it did not owe a legal duty of disclosure to Companions, (2) the evidence was insufficient to establish that A&B's allegedly tortious interference caused Companions to suffer any losses or damages, (3) there was no violation of CUTPA because there was no tortious interference, and (4) the trial court improperly found that A&B had tortiously interfered with noncompete agreements between Companions and its employees because those agreements are void as against public policy. We affirm the judgment of the trial court.

[1] While this appeal was pending, this court granted Companions' motion to substitute C&H Holdco, Inc., as the plaintiff.

[2] The defendant, A&B Homecare Solutions, LLC (A&B), doing business as Northwest Homecare, appealed to the Appellate Court from the judgment of the trial court. The trial court subsequently awarded Companions punitive damages and attorney's fees, and A&B amended its appeal to account for that award. Thereafter, we transferred the amended appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

The trial court found the following facts. Companions is the largest provider of Medicaid and state funded home care services in Connecticut. It provides in-home assistance to elderly Connecticut residents who are at risk of nursing home placement. Some of these services are provided through a provider enrollment agreement with the Department of Social Services (DSS), which operates a Medicaid and state funded program called the Connecticut Home Care Program for Elders (CHCPE). Pursuant to the provider enrollment agreement, Companions matched at risk seniors with its employees, who would provide "nonmedical personal, homemaking, and companion care to clients." A&B, a competitor of Companions, is the third largest provider of such services in the state. A&B is also assigned at risk patients under a provider enrollment agreement with DSS. Companions' provider enrollment agreement with DSS became the focus of one significant part of Companions' claim of tortious interference against A&B.

In March, 2016, DSS implemented a new billing and timekeeping system, the Electronic Visit Verification system (EVV), for Medicaid home care providers such as the parties. DSS notified its home care providers that they would be required to use EVV effective January 1, 2017. Unhappy with this new requirement, Companions contacted other large, home care providers, including A&B, to see if they would be interested in joining a legal challenge, under the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., against the implementation of EVV. Companions offered to cover all costs of the litigation. A&B and three other home care providers agreed to join Companions in the lawsuit.

From the start, A&B's chief executive officer, Aron Galinovsky, represented to Companions that he had "concerns about being able to bill or pay correctly through EVV." Galinovsky gave Companions a list of

operational concerns about EVV and asserted that A&B had not been given enough time to train its employees. Galinovsky personally approved the filing of a verified complaint in the Superior Court, seeking injunctive relief from DSS's implementation of EVV and alleging that the EVV program was an unpromulgated regulation, in violation of the UAPA. In that complaint, the home care providers alleged that they "were unable to implement EVV" and would be irreparably harmed if it became mandatory. A&B also agreed to send a letter to DSS, in which the home care providers involved in the litigation stated "that [they] had found the platform for EVV to be unworkable . . . ."

Despite these representations, and without informing Companions or the other home care providers, A&B began to implement EVV by using it to submit claims and bills for Medicaid services. By November, 2016, A&B had billed DSS more than $234,000 through EVV, whereas the other home care providers had billed nothing using the new system. Galinovsky hid this activity from Companions, despite knowing that Companions was relying on his representations that A&B was unable to use EVV.

The first time that Companions heard of A&B's using EVV was at a court hearing on November 21, 2016, when that fact was mentioned by DSS's counsel. Companions confronted A&B regarding its use of EVV, but Galinovsky assured Companions that A&B "had only used EVV for testing and remained convinced [that] it was unworkable." The court found that this misrepresentation misled Companions. Additionally, the court concluded that A&B's use of EVV "demonstrated to DSS that A&B was ready to take business from noncompliant providers."

On December 15, 2016, the home care providers were denied prejudgment relief in their litigation against DSS. Galinovsky told Companions that A&B "would like to

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

be part of an appeal'' from the trial court's order, and Companions filed an appeal including A&B as an appellant. Galinovsky concealed from Companions the fact that, ''the very next day after the issuance of the [trial] court's decision, he was directly communicating with Kathy Bruni, the director of DSS's Community Options Unit, about A&B's successful efforts to implement EVV.'' Galinovsky told Bruni that A&B was committed ''to 'use, bill, and work with' the EVV system'' and that, '' 'with each passing week, [it] utilize[s] the system more and more and ha[s] billed [more] through the system.'' Galinovsky's communications with Bruni directly contradicted his representations to Companions and undermined the position that Companions and the other providers, including A&B, were taking in their ongoing litigation.

The trial court found that Galinovsky had intentionally ''played both sides of the litigation'' because doing so ''enabled him to continue to receive strategic information from the [other providers] and to plan to benefit at their expense from their nonuse of EVV.[3] At the same time, his communications to Bruni negatively impacted the bargaining power of the other [providers].'' (Footnote added.) By late December, 2016, A&B had billed more than \$715,000 through EVV, whereas Companions and the other providers in the lawsuit still ''had not billed a single claim . . . .''

As the January 1, 2017 deadline for the implementation of EVV approached, Companions' general counsel sought and received Galinovsky's agreement that A&B would not take clients or employees from Companions. The trial court found that, ''[i]n reliance on assurances from A&B and the other providers,'' Companions sent a letter to DSS advising it that Companions could not

[3] There is no evidence in the record that Companions and A&B were parties to a joint agreement defining their duties to one another in the litigation to which they both were parties.

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

use EVV and planned to continue to bill outside of the system. Companions argued that it could not use EVV because it would "violate existing laws," including laws pertaining to "employee rights with regard to personally identifiable data" and "state and federal wage and hour laws." (Emphasis omitted.) Days later, DSS terminated its provider enrollment agreement with Companions, effective February 3, 2017, due to Companions' deliberate refusal to comply with the EVV requirement.

DSS's decision to terminate its provider enrollment agreement with Companions was based, in part, on its knowledge that A&B had successfully implemented EVV and that it could rely on A&B to take on Companions' clients. Before DSS terminated its agreement with Companions, Bruni spoke to A&B about taking on Companions' clients. When DSS terminated its agreement with Companions, A&B immediately began taking Companions' clients through referrals from DSS. In fact, A&B admitted that it took at least eighty to eighty-five of Companions' clients in the Litchfield area in January, 2017. At that time, A&B had never received this volume of referrals before. Galinovsky also worked to hire Companions' employees, even though he was aware that those employees were bound by noncompete agreements. Galinovsky sent his staff a list of attorneys who could help Companions' employees challenge their noncompete agreements. He remained in touch with Bruni and gave her a status update on the transfer of clients from Companions to A&B.

Following DSS's decision to terminate its provider enrollment agreement with Companions, the litigation against DSS continued with the parties as coplaintiffs. A mediation was scheduled for January 17, 2017, and Galinovsky agreed to provide Companions' general counsel with "bullet points" for use in negotiations. Galinovsky's conduct was deceptive in that he misled Companions as to the extent of A&B's ongoing prob-

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

lems with EVV and did not disclose that A&B was making a concerted effort to take Companions' clients and employees.

Two days before the mediation, Galinovsky informed Companions that he would not attend. He told Companions that A&B " 'should probably stay away from things as [it] will only hurt your case since [A&B has] billed and received nearly [$800,000].' " Galinovsky's reference to " 'your case' " ignored the fact that A&B remained a coplaintiff and a party to the appeal, and never withdrew from the litigation. Galinovsky gave Companions authority to settle the case, but, after the case successfully settled, he objected to the proposed settlement. The trial court observed that, every day the case was not settled, A&B was permitted to obtain additional clients from Companions, and found that A&B's objection to the settlement, after providing settlement authority, was an attempt to keep Companions from being reinstated.

Companions filed the present action against A&B, alleging tortious interference with contractual and business relations and a violation of CUTPA. The first count of the complaint alleged that A&B had tortiously interfered with Companions' provider enrollment agreement with DSS, and with Companions' noncompete agreements with its employees. The second count alleged that A&B's tortious interference with those contractual relationships constituted "unfair and deceptive acts and practices in the conduct of trade or commerce [that] are unethical, unscrupulous and offensive to public policy," in violation of CUTPA.

The trial court rendered judgment for Companions following a fourteen day bench trial. The court determined that A&B had tortiously interfered with both Companions' contractual relationship with DSS and its noncompete agreements with its employees. The trial

court's conclusion of tortious interference with the provider enrollment agreement was based on its finding that A&B's conduct in the litigation against DSS—and, in particular, numerous statements and assurances made by Galinovsky to Companions in connection with the litigation—"amount[ed] to misrepresentation and [was] tortious." The court explained that A&B's "deceptive conduct was actuated, at least in part, by an improper purpose, [namely] to interfere with Companions' provider enrollment agreement with DSS and to drive Companions from the CHCPE program, which would render Companions ineligible to provide home assistance services . . . to elderly beneficiaries, who make up a significant portion of [its] client base." The court found that A&B's misrepresentations to Companions throughout the litigation caused harm to Companions because A&B's scheme "undermined Companions' position in the . . . litigation [against DSS] and demonstrated to DSS that [A&B] was prepared to utilize EVV and to serve clients in a geographically difficult service area (Litchfield County). Without A&B's willingness to take Companions' matches, Companions would not have lost the [eighty to eighty-five] clients taken by A& B. A&B's tortious conduct was a proximate cause of losses incurred by Companions in that, as a result, DSS terminated Companions' provider enrollment agreement, reassigned clients away from Companions, stopped referring new clients to Companions, and did not rescind the notice of termination until after the mediated settlement."

The court also found tortious interference with Companions' noncompete agreements on the ground that A&B had "assur[ed] Companions that it would not take Companions' [employees] but (1) then did so anyway (2) with [the] knowledge that noncompete agreements existed between the [employees] and Companions, and (3) A&B provided access to legal counsel to [Compan-

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

ions' employees] to assist them in avoiding their obligations under the noncompete agreements.'' In arriving at this determination, the court declined to address A&B's claim that the noncompete agreements were unenforceable on the ground that they violated public policy, concluding that a contract need not be enforceable to be the object of tortious interference with a contractual relations claim. The court further found that A&B's tortious interference with Companions' contractual relationships violated CUTPA.

The trial court awarded Companions compensatory damages in the amount of $118,008 for lost profits related to the reassignment of CHCPE clients from Companions to A&B. Pursuant to CUTPA, the court awarded Companions punitive damages in the amount of $354,000 and attorney's fees in the amount of $533,242.57 after a separate hearing. This appeal followed.

I

TORTIOUS INTERFERENCE WITH COMPANIONS'
PROVIDER ENROLLMENT AGREEMENT
WITH DSS

A&B argues that it did not tortiously interfere with Companions' contractual relationship with DSS as a matter of law. A&B argues that ''the trial court relied [on its] failure to disclose as a basis for [fraudulent] misrepresentation'' and that ''[a] failure to disclose can . . . constitute a misrepresentation [only] if there is a duty to disclose.'' (Emphasis omitted.) A&B contends that it owed Companions no duty to disclose and, therefore, did not tortiously interfere with Companions' provider enrollment agreement with DSS. Whether the trial court erred in finding liability without determining that A&B owed Companions a duty to disclose is a question of law, which we review de novo. See, e.g., *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 84, 873 A.2d 929 (2005).

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

"A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the [defendant's] knowledge of that relationship, (3) the [defendant's] intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the [defendant's] tortious conduct." (Internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 864, 124 A.3d 847 (2015). The trial court found that A&B's conduct was tortious because it constituted fraudulent misrepresentation. That tort has four elements: (1) a false representation was made by the defendant as a statement of fact; (2) the statement was known to be untrue by the defendant; (3) the statement was made with the intent to induce reliance; and (4) the other party relied on the statement to its detriment.[4] See *Nazami* v. *Patrons Mutual Ins. Co.*, 280 Conn. 619, 628, 910 A.2d 209 (2006). Fraudulent misrepresentation can be based either on express statements or on a failure to disclose information when there is a duty to disclose. See, e.g., *Weinstein* v. *Weinstein*, 275 Conn. 671, 695, 882 A.2d 53 (2005); see also *Pospisil* v. *Pospisil*, 59 Conn. App. 446, 450, 757 A.2d 655, cert. denied, 254 Conn. 940, 761 A.2d 762 (2000) ("[f]raud by nondisclosure, which expands on the first three of [the] four elements [of fraud], involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there is a duty to speak" (internal quotation marks omitted)).

---

[4] Although there are circumstances in which the plaintiff's reliance must be reasonable for the false representation to be actionable, we do not address this issue because it has not been raised or briefed by the parties. See 3 Restatement (Second), Torts § 537, p. 80 (1977) ("[t]he recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, (a) he relies on the misrepresentation in acting or refraining from action, and (b) his reliance is justifiable").

We disagree with the fundamental premise of A&B's argument disputing liability: its contention that "[t]he trial court did not find that [it] made any express misrepresentation[s] . . . ." To the contrary, the court very clearly found that A&B made multiple, false representations to Companions, which Companions relied on to its detriment. For example, the court found: Galinovsky, on behalf of A&B, "approved the filing of the verified complaint" alleging that A&B was "unable to implement EVV"; "[o]n December 8, 2016, [Galinovsky] provided an email [to Companions] detailing operational problems" with EVV; these statements "misled Companions as A&B continued to implement EVV"; and the extent of A&B's use of EVV "undermined the representations made by A&B in the verified complaint" and "belied its previous representation that it had . . . tested the system [only] on a limited basis." The court also found that Companions "received Galinovsky's agreement that A&B would not take Companions' matches" and acted "[i]n reliance on assurances from A&B . . . that [it] would not take Companions' matches . . . ." In summary, the court found that Companions "relied on A&B's *representations* in the course of the legal challenge to EVV." (Emphasis added.) We previously have held that "[a] duty to disclose will be imposed . . . on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak." (Internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 636, 804 A.2d 180 (2002). The trial court found that Galinovsky's statements were "deceptive," both because he repeatedly "assured Companions that A&B could not implement EVV" while simultaneously "implement[ing] and . . . using the system," and because Galinovsky assured Companions "that [A&B] would not take Companions' matches" while "making a concerted effort to

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

take Companions' matches.'' The trial court noted that this ''deceptive conduct was actuated, at least in part, by an improper purpose, [namely] to interfere with Companions' provider enrollment agreement with DSS . . . .''

The memorandum of decision is abundantly clear that the trial court based its finding of tortious interference with Companions' provider enrollment agreement with DSS on A&B's false representations, not its mere silence. There was, therefore, no error in failing to identify an affirmative duty to disclose on the part of A&B.[5]

## II

## CAUSATION AND DAMAGES

A&B next claims that there was insufficient evidence to support the trial court's factual finding that its conduct caused Companions to suffer any damages. Specifically, A&B argues that ''[t]here was no evidence that [it] caused or played a role in'' DSS's decision to terminate the agreement with Companions and that ''all of the evidence demonstrated that DSS's decision was

_____

[5] There are facts of record that we do not include in our discussion because we find them irrelevant to our resolution of the issues raised on appeal, and there are legal claims that either have not been preserved, were not argued on appeal, or are obviated by our determination that at least one of A&B's affirmative misrepresentations supports the trial court's finding of tortious interference. For example, because we conclude that Galinovsky made affirmative statements to Companions that were false and on which Companions relied, we do not need to reach the issue, raised by the substitute plaintiff, of whether jointly represented coplaintiffs in litigation have affirmative duties to disclose material information. Also, because A&B has not raised the issue on appeal, we do not consider whether Companions reasonably relied on its competitor's false representations about its state of compliance with the EVV program and whether A&B would take Companions' matches. See footnote 4 of this opinion. Finally, because the trial court declined to reach the issue on the ground that it was not adequately briefed, we do not consider whether an agreement among these competitors not to implement EVV while agreeing not to take one another's clients violated the law. We have no occasion to decide whether any of these facts or claims might have affected the analysis of a claim of tortious interference.

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

reached independently, and was not influenced or affected by A&B.” In support of this assertion, A&B argues that Bruni, the person at DSS who had been in contact with Galinovsky, was not directly involved in the decision to terminate the agreement with Companions and that “[e]ach of the DSS officials who testified agreed that the sole reason for the termination [of the agreement] was [Companions’] written refusal to implement EVV,” as opposed to any misrepresentation made by A&B. The record does not support this assertion.

To prevail on a claim of tortious interference with contractual relations or business expectancies, the plaintiff must establish that, “as a result of the interference, [it] suffer[ed] actual loss.” *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 27, 761 A.2d 1268 (2000). “Thus, it must appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into [or retained] a contract or made a profit. . . . Such a determination is a question for the trier of fact, as is the question of whether the plaintiff has suffered an actual loss.” (Citation omitted; internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 97, 920 A.2d 357, cert. denied, 284 Conn. 901, 931 A.2d 261 (2007); see *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 874, 124 A.3d 847 (2015) (“[p]roof that some damage has been sustained is necessary to [support a cause of action for tortious interference]” (internal quotation marks omitted)).

“The determination of causation in the present case is a finding of fact, subject to the clearly erroneous standard of review on appeal. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mis-

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

take has been committed.'' (Internal quotation marks omitted.) *Lipshie* v. *George M. Taylor & Son, Inc.*, 265 Conn. 173, 182, 828 A.2d 110 (2003). Similarly, ''[t]he determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . We are, therefore, constrained to accord substantial deference to the fact finder on the issue of damages.'' (Citations omitted; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 68–69, 717 A.2d 724 (1998).

The trial court found that A&B's tortious conduct caused Companions to suffer an actual loss because DSS ''terminated Companions' provider enrollment agreement, reassigned clients away from Companions, stopped referring new clients to Companions, and did not rescind the notice of termination until after the mediated settlement.'' A&B claims that these factual findings are not supported by the evidence because there was insufficient evidence to conclude that DSS relied on A&B's assurances that it could take over Companions' clients if DSS terminated its agreement with Companions.

This argument fails for two reasons. First, there was sufficient evidence to support the trial court's finding that DSS relied on A&B's assurances that it could take over Companions' clients. A&B contends that the two most senior DSS officials maintained at trial that the decision to terminate Companions' provider enrollment agreement was not made in reliance on communications with A&B. It appears that the trial court did not find that testimony credible and reached a contrary

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

conclusion on the basis of other evidence. See, e.g., *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 346 Conn. 391, 413 n.16, 291 A.3d 64 (2023) (''[i]t is well established that the trial court, as the finder of fact, has discretion to reject even uncontested evidence, on the theory that the fact finder is uniquely well situated to make determinations of witness credibility'' (internal quotation marks omitted)). Another DSS official, Bruni, testified that she was aware of A&B's use of EVV, had communicated directly with Galinovsky about A&B's taking over Companions' clients, and was indeed involved in the termination decision. The trial court could have credited Bruni's testimony that her ''primary responsibility, as director of community options, [was] to ensure that the clients . . . are getting the services [they] need,'' that she was aware at the time that A&B had been using EVV and was willing to take over Companions' clients, and that she ''was involved in'' the decision to terminate Companions' provider enrollment agreement. In short, the trial court reasonably could have relied on the ample, circumstantial evidence to conclude that DSS knew that A&B was available to take over Companions' clients and relied on that fact in making its decision to terminate Companions' provider enrollment agreement. We cannot conclude on this record that the trial court's factual findings on causation were clearly erroneous.

Second, the fact that DSS relied on A&B's assurances that it could take over Companions' clients was not the only basis for the trial court's finding that A&B's conduct was a cause of the termination of the provider enrollment agreement. The court identified other ways in which A&B's conduct was a cause of Companions' loss. The memorandum of decision repeatedly emphasized the fact that A&B misled Companions about A&B's use of EVV and its willingness to take Companions' matches, and that Companions relied on these mis-

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

leading statements throughout its litigation with DSS. In particular, the court found that Companions' crucial decision to send a letter to DSS on December 29, 2016, stating that it would not meet the January 1, 2017 deadline to implement EVV, was made "[i]n reliance on [Galinovsky's] assurances . . . that [A&B] would not take Companions' matches, and after reviewing its strategy with" A&B. There was ample evidence to support this finding. For example, Companions' chief operating officer, William Geiger, testified that the decision to send the December 29 letter was based on the "overall strategy . . . [that] we had strength in numbers . . . ." Geiger continued: "We felt like we had assurances from all the providers . . . that [our] matches would be honored and . . . that there would be no way for DSS to provide alternat[ive] care for those clients." A&B does not dispute that the decision to send the December 29 letter directly led to DSS's decision to terminate Companions' provider enrollment agreement.

There likewise was sufficient evidence to support the trial court's finding regarding the damages sustained by Companions. The court relied on the testimony of Companions' expert, Karen H. Cusato. Cusato calculated the lost profits incurred by Companions as a result of its clients being transferred by DSS to A&B during the relatively brief period in 2017 when DSS had terminated Companions' provider enrollment agreement. She calculated lost profits from the time a client was transferred from Companions until the day that client was returned or, for clients who did not return, for one year from the day the client was transferred. Using this method, Cusato calculated Companions' lost profits to be $118,008.[6] The record supports the trial court's fac-

---

[6] Cusato provided two different methods to calculate Companions' lost profits. First, she used the growth in Companions' profit from 2015 to 2016 to extrapolate what its profit would have been in 2017 but for A&B's interference, and then subtracted its saved operating expenses to determine the total amount of its lost profits. That method resulted in lost profits of $1,386,479. Second, as an alternative damages model, she calculated the

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

tual finding regarding the amount of damages that Companions sustained as a result of A&B's tortious interference with its provider enrollment agreement with DSS.[7]

### III

### CUTPA

The trial court found that A&B's conduct violated CUTPA because A&B had tortiously interfered with Companions' contractual relations. See, e.g., *Sportsmen's Boating Corp.* v. *Hensley*, 192 Conn. 747, 757, 474 A.2d 780 (1984) ("it is difficult to conceive of a situation [in which] tortious interference would be found but a CUTPA violation would not"). On appeal,

---

lost profits from each individual client who was identified as having been transferred from Companions to A&B after DSS terminated Companions' provider enrollment agreement. This second method resulted in lost profits of $118,008. The trial court evidently credited the second method, which was considerably more precise and better supported, although it resulted in a substantially lower award for Companions.

[7] Having upheld the trial court's finding that A&B caused these damages by tortiously interfering with Companions' provider enrollment agreement with DSS, we need not reach the issue, raised by A&B, of whether it tortiously interfered with Companions' noncompete agreements with its employees. Any error with respect to the noncompete agreements was harmless because the court's award of damages is independently supported by its finding that A&B had tortiously interfered with Companions' provider enrollment agreement. The court adopted the same measure of damages for each of the two different findings of tortious interference. The court's award of punitive damages and attorney's fees, made after a separate hearing, likewise appears to be entirely supported by the finding that A&B had tortiously interfered with Companions' provider enrollment agreement. A&B, which bears the burden of showing harmful error, has not made any argument to the contrary. See, e.g., *Prentice* v. *Dalco Electric, Inc.*, 280 Conn. 336, 358, 907 A.2d 1204 (2006) (trial court's error "will result in a new trial only if the ruling was both wrong *and* harmful" (emphasis in original; internal quotation marks omitted)), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007); *Manning* v. *Michael*, 188 Conn. 607, 611, 452 A.2d 1157 (1982) ("[t]he burden of proving harmful error rests on the party asserting it"). We therefore conclude that any error by the trial court with respect to A&B's interference with the noncompete agreements likely did not affect its finding of liability or award of damages and, therefore, was harmless.

152          OCTOBER, 2023          348 Conn. 132

Companions & Homemakers, Inc. *v.* A&B Homecare Solutions, LLC

A&B argues that it did not engage in tortious interference and that the trial court therefore erred in concluding that A&B violated CUTPA. In light of our conclusion that the evidence was sufficient to support the trial court's finding that A&B had tortiously interfered with Companions' contractual relationship with DSS; see parts I and II of this opinion; we uphold the trial court's decision that A&B's conduct was a violation of CUTPA.

The judgment is affirmed.

In this opinion the other justices concurred.